RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0121p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

MARK CHARLTON-PERKINS,

    *Plaintiff-Appellant*,

v.

UNIVERSITY OF CINCINNATI; KENNETH PETREN and GEORGE UETZ, in their official and individual capacities,

    *Defendants-Appellees*.

No. 21-3840

---

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:20-cv-00179—Timothy S. Black, District Judge.

Argued: May 16, 2022

Decided and Filed: June 3, 2022

Before: SILER, BUSH, and MURPHY, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Marc D. Mezibov, MEZIBOV BUTLER, Cincinnati, Ohio, for Appellant. Evan T. Priestle, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Marc D. Mezibov, Brian J. Butler, MEZIBOV BUTLER, Cincinnati, Ohio, for Appellant. Evan T. Priestle, Brian G. Dershaw, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellees.

---

**OPINION**

---

    JOHN K. BUSH, Circuit Judge. Appellant Mark Charlton-Perkins, a male research scientist, applied for a professorship at the University of Cincinnati ("UC") in late 2017.

Yet after UC determined him the most-qualified candidate for the position, or so he alleges, it refused to hire him on account of his gender. Adding insult to injury, UC then discriminatorily canceled the job search itself, ensuring that Charlton-Perkins could never fill the position. In response, he filed the present lawsuit. But the district court dismissed his complaint for lack of subject-matter jurisdiction. Because *nobody* ever filled the canceled position, it reasoned, Charlton-Perkins's claims never ripened into an adverse employment action, and thus he suffered no concrete injury cognizable in federal court. We now reverse. Charlton-Perkins has plausibly alleged a ripe employment-discrimination claim, so his suit may proceed.

**I.**

The amended complaint alleges as follows. Around September 2017, UC's Department of Biological Sciences ("the Department") determined that it needed to appoint an additional researcher to its faculty as an assistant professor. To that end, a search committee was formed, consisting of four faculty members and one non-voting graduate student. Dr. Elke Buschbeck, a professor in the Department, served as the search committee's chair. The committee advertised the Department's new position and met with the relevant officials to ensure that the search process complied with established equal-employment policies.

Sixty-two candidates applied. The search committee winnowed the list down to seven candidates who were rated "strong," along with ten other candidates who were rated "particularly strong." And that list was further refined to just nine candidates. Those candidates were then invited to interview with members of the search committee via Skype.

One of the candidates so selected was Dr. Mark Charlton-Perkins. Charlton-Perkins is a research scientist, male, and U.S. citizen currently employed by the University of Cambridge in the United Kingdom.

After the search committee assembled its list of top candidates, Dr. Buschbeck realized a potential conflict of interest: she had collaborated with Charlton-Perkins on various projects several years in the past. Dr. Buschbeck alerted members of the search committee about that previous relationship. She also consulted with Marilyn Kershaw—the Director of the Office of Diversity and Access and the Superintendent of Graduate Student Recruitment at UC's

McMicken College of Arts and Sciences—to determine whether there was, or might be the appearance of, a conflict of interest. Dr. Kershaw assured Dr. Buschbeck that there was not. Thus, Charlton-Perkins's candidacy continued.

Dr. George Uetz, chair of the Department, then authorized the search committee to invite five finalists for on-campus interviews. One of the candidates, a female, declined the invitation. So only the top four candidates were interviewed in person: Charlton-Perkins, another male candidate, and two female candidates. After the interviews and faculty feedback, the search committee ranked the top four. Further discussion eliminated the other male candidate, leaving only Charlton-Perkins and the two female candidates in the competition.

The committee took its final vote on those three candidates on February 23, 2018. Charlton-Perkins was rated the favorite by a vote of three to one. That fact was significant. As was specified in a collective-bargaining agreement ("CBA") between the faculty and UC, "the appointment of a Faculty Member to an Academic Unit shall normally be based on a recommendation initiated within and approved by the Faculty of that Academic Unit using procedures developed within that Academic Unit." "Accordingly, the search committee was vested with the authority to determine the candidate to be selected for the position."[1]

On February 26, 2018, Dr. Buschbeck met with Dr. Uetz to inform him of the vote, and thus that the committee recommended that Charlton-Perkins be hired. Dr. Buschbeck also informed Dr. Uetz that the two female candidates had tied in the rankings. For the first time, however, Dr. Uetz told Dr. Buschbeck that Kenneth Petren—dean of the College of Arts and Sciences—had decided to hire *two* candidates for the position, rather than just the one originally contemplated.

On March 4, 2018, Dr. Uetz explained to the search committee that Dean Petren believed the most appropriate course of action was "to focus on the women candidates first." He also conveyed that Petren "fe[lt] that he might make a case to hire two strong women candidates."

---

[1]Note the tension between these two allegations: the complaint says that under the CBA (which is not in the record), the search-committee recommendation would "normally" be followed, but it also says that the search-committee "had the authority to determine" the selection. We explore this issue—and the district court's treatment of it—*infra* at note 7.

After receiving that message, Dr. Buschbeck responded on March 5, 2018, that "[p]utting two lower ranked candidates up first is not only against the recommendation of the committee but also plain discrimination." Yet Uetz and Petren were apparently unmoved. For later that same day, Dr. Uetz emailed Dr. Buschbeck explaining that "your advise [*sic*] and discussion of the candidates' strengths and weaknesses, along with my own judgment and extensive discussions with the dean, has [*sic*] guided the choice of actions." His email also asked Dr. Buschbeck to "understand how difficult this decision has been for me," but that "the dean and I have agreed with the ultimate hiring choices we have made."

Three days later, Dean Petren met with Dr. Buschbeck and announced that the search had been tainted by her past collaboration with Charlton-Perkins. Dr. Buschbeck responded by reminding Dean Petren that her past relationship with Charlton-Perkins had been disclosed to, and vetted by, Dr. Kershaw, who had given Dr. Buschbeck approval to proceed with the search. Nevertheless, on March 13, 2018, Dean Petren informed the faculty that he believed an "equitable search" was impossible under the circumstances, and thus that he "was cancelling the search in its entirety."

Charlton-Perkins filed this lawsuit in response in March 2020. He alleges that UC, a federally funded institution, failed to hire him "solely on account of his gender." He also alleges that Dean Petren and Dr. Uetz's actions "in not hiring [him] and cancelling the search were committed intentionally, purposefully, maliciously, and in conscious and deliberate disregard for [his] right to not be subjected to gender discrimination." Against UC, therefore, Charlton-Perkins asserts a failure-to-hire claim under Title IX, 20 U.S.C. § 1681. As a remedy, he seeks compensatory damages for the past violation and either instatement into the position or front pay as well. And against Uetz and Petren, he asserts under 42 U.S.C. § 1983 that the pair violated his clearly established equal-protection rights against gender discrimination.

In response, defendants moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. In their view, sovereign immunity shields UC from the § 1983 action against Uetz and Petren in their official capacities, qualified immunity shields the pair in their personal capacities, Charlton-Perkins alleges no adverse employment action under Title IX or § 1983, and, relatedly, his suit is not yet ripe. That last point was so,

they said, because *nobody* was ever hired for the position, and "[i]t makes no sense that Plaintiff's failure-to-hire claims could be ripe without any hire at all."

Relying on that latter argument, the district court dismissed the complaint. *See Charlton-Perkins v. Univ. of Cincinnati*, No. 1:20-cv-179, 2021 WL 3737910, at *6 (S.D. Ohio Aug. 24, 2021). It understood "the issue" here as "whether Dr. Charlton-Perkins'[s] claims are ripe when the search for the position was cancelled and the position never filled." *Id.* at *4. And, reasoning from that premise, the district court believed that Charlton-Perkins had failed to show ripeness. In its view, his claims "are not concrete," but instead "dependent on a future event—Defendants hiring a female candidate instead of him." *Id.* Until such a hiring occurred, it said, Charlton-Perkins suffered no "discrete harm." *Id.* And thus the district court dismissed the case for lack of subject-matter jurisdiction. *Id.* at *6.

This timely appeal followed. After examining our appellate jurisdiction and standard of review, we turn to why the district court's judgment must be reversed.

## II.

The district court's decision dismissing Charlton-Perkins's complaint for lack of jurisdiction was a final decision. *See Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 408–09 (2015). We therefore have appellate jurisdiction under 28 U.S.C. § 1291.

## III.

Defendants assert that even taking Charlton-Perkins's allegations as true, they do not establish Article III jurisdiction. This is a so-called "facial attack" on jurisdiction, which "merely [tests] the sufficiency of the pleading." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). We thus take the well-pleaded allegations as true, view them in the light most favorable to Charlton-Perkins, and ask whether they amount to a ripe case or controversy. *Id.*; *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). And we review *de novo* the district court's conclusion to the contrary. *Haio v. I.N.S.*, 199 F.3d 302, 304 (6th Cir. 1999).

## IV.

As mentioned, the district court dismissed Charlton-Perkins's complaint because his claims are supposedly unripe, which the district court considered a jurisdictional defect under Article III. *See Charlton-Perkins*, 2021 WL 3737910, at *6. At the same time, however, the district court oscillated between a true Article III ripeness analysis—whether the asserted injury is sufficiently imminent to warrant judicial intervention—and a Rule 12(b)(6) analysis—whether Charlton-Perkins had plausibly pleaded "the essential elements of his claims." *Id.* at *5 ("The un-ripe nature of Dr. Charlton-Perkins'[s] claims is further demonstrated by his inability to plead the essential elements of his claims."). Yet those are distinct inquiries. The former concerns whether the district court had Article III *jurisdiction* over the suit, while the latter concerns whether Charlton-Perkins's complaint fails *on the merits*. In any event, the district court was mistaken on both accounts, as explained below.

> 1. *The District Court Erred When It Held that a Completed, Past Act of Alleged Discrimination Against Charlton-Perkins was Not a Ripe Injury Under Article III*

The crux of the district court's jurisdictional analysis—which appellees now reprise before us—is that Charlton-Perkins suffered no "discrete harm" because some *other* candidate never received the relevant position. *Id.* at *4. But that conclusion does not necessarily follow from the premise. No matter whether somebody else ever got the spot, it has always been the case that Charlton-Perkins was *denied* the spot. So Charlton-Perkins has always had *that* de facto injury—he has always been stuck with the denial—no matter whether someone else got the position instead.

So why did the district court think that Charlton-Perkins suffered no harm unless he could also allege that somebody else got the spot? The district court apparently assumed that unless Charlton-Perkins could allege all the requirements of a prima facie case under Title VII,[2] he had

---

[2]Though Charlton-Perkins brings claims under Title IX and 42 U.S.C. § 1983, when those causes of action are used to assert employment-discrimination claims, courts often look to concepts from Title VII, given the highly developed body of caselaw in that area. *See, e.g.*, *Nelson v. Christian Brothers Univ.*, 226 F. App'x 448, 454 (6th Cir. 2007) ("Generally, courts have looked to Title VII, 42 U.S.C. § 2000e, as an analog [*sic*] for the legal standards in both Title IX discrimination and retaliation claims." (citation omitted)); *see also Arceneaux v. Vanderbilt Univ.*, 25 F. App'x 345, 347 (6th Cir. 2001); *Smith v. City of Salem*, 378 F.3d 566, 576–77 (6th Cir. 2004).

suffered no de facto injury under Article III. Indeed, looking to principles from Title VII, the district court reasoned that no de facto injury occurs unless the plaintiff (1) is a member of a protected class, (2) was qualified for and applied for the job, (3) was denied it, and (4) an individual of similar qualifications not in the plaintiff's protected class got the job. *Id.* at *5. Because Charlton-Perkins could not plausibly plead element (4), he suffered no "discrete harm," in the district court's view, and would suffer none until the contingent event of some third party's hiring. *Id.* at *4. That seems to be why the district court explicitly conflated the jurisdictional inquiry and the Rule 12(b)(6) inquiry multiple times.

Yet the district court's conflation of jurisdiction and the merits cuts against the basic principle that those distinct analyses must be conducted separately. *See, e.g.*, *Bond v. United States*, 564 U.S. 211, 219 (2011) ("[T]he question whether a plaintiff states a claim for relief 'goes to the merits' in the typical case, not the justiciability of a dispute, and conflation of the two concepts can cause confusion." (citation omitted)). In reality, it is possible that a plaintiff can have a cause of action—a legally recognized mechanism of obtaining a remedy—and yet no Article III standing to assert that cause of action in federal court. *See, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341–42 (2016) (cause of action but no standing). Conversely, it is also possible to have a redressable, de facto injury sufficient to confer Article III jurisdiction, and yet have no recognized cause of action to vindicate that interest. *See, e.g.*, *Kentucky v. Biden*, 23 F.4th 585, 602 (6th Cir. 2022) ("Just because the plaintiffs have standing to sue, of course, does not mean that they have a cause of action with which they can vindicate their purported interests."). In other words, whether a plaintiff can get into federal court under Article III—a jurisdictional question—is not determined by whether he can also plausibly plead the elements of a cause of action—a merits question. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("Jurisdiction is not defeated by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." (cleaned up)); *see also Bell v. Hood*, 327 U.S. 678, 684–85 (1946); *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 488–90 (6th Cir. 2021).

Untangling these distinct concepts makes it easier to see why, after all, the district court had Article III jurisdiction to adjudicate Charlton-Perkins's claims. Start with the basic issue of

standing. As the Supreme Court has long explained, to establish standing at the motion-to-dismiss stage, plaintiffs must plausibly allege (1) a concrete and particularized injury in fact that is actual or imminent, (2) the defendant caused the injury in fact, and (3) the injury would likely be redressed by a decision in favor of the plaintiff. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021).

Charlton-Perkins has satisfied each of those basic requirements. He has an obvious de facto injury—that he was denied the benefit of the position at UC. *That* past injury is in no sense speculative; defendants here do not dispute that he was denied the position. As for traceability, defendants caused that completed injury,[3] since they were the decisionmakers who denied Charlton-Perkins the position. And the district court could redress it if it were to dispense the various remedies that Charlton-Perkins seeks. Charlton-Perkins thus established Article III jurisdiction over this suit.

So where does ripeness come in? Ripeness here is, in our view, a red herring.[4] Ripeness concerns arose only because of the district court's erroneous view that Charlton-Perkins suffered no de facto injury unless he could also plead all the requirements of a prima facie case; particularly, that someone else filled the position. Until *that* happened, the district court believed, Charlton-Perkins's asserted injury was speculative and contingent. But again, that assumption is incorrect. Charlton-Perkins suffered the de facto injury that he was not selected for the position. That de facto injury has nothing to do with whether someone else ever got the

---

[3]A few words on our use of the term "completed injury." We say "completed" here solely in reference to the question whether Charlton-Perkins's injury is ripe—*not* whether he can obtain injunctive relief to redress that injury under *Ex parte Young*, 209 U.S. 123 (1908), which requires a continuing violation of the law. *See Carten v. Kent State Univ.*, 282 F.3d 391, 396 (6th Cir. 2002). It is possible for a past failure to hire to be completely executed—and thus ripe for adjudication—and yet that such a past event imposes continuing harmful effects, making reinstatement prospective and thus permissible even despite sovereign immunity. *See id.* We take no position on that particular issue in the present opinion.

[4]Ripeness is really, or at least paradigmatically, a doctrine about *pre-enforcement* challenges. That is why the relevant factors—whether the claim "concerns a dispute that is likely to come to pass" and whether there would be "hardship to the parties of withholding court consideration"—sound so out of place in the context of Charlton-Perkins's claim. *See Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). Here, we are not dealing with a situation in which a plaintiff wants to engage in a future course of conduct affected with a constitutional interest but against which the state may take an enforcement action. We are instead confronting an already-executed act of alleged discrimination.

job. For that matter, Charlton-Perkins *himself* could later get the job and it would not erase the fact that he was denied the opportunity to get it in the first instance in 2018. So his injury is not speculative or even imminent; it is instead "actual" because the denial has undisputedly already occurred. *Cf. Lujan*, 504 U.S. at 560.

For the same reasons, unsurprisingly, defendants' new argument on appeal that Charlton-Perkins lacks standing to sue because he suffered no adverse employment action (and thus no concrete injury) must also fail. *See* Appellees' Br. at 20. Like the district court below, they can only arrive at that conclusion by grafting the prima-facie-case requirement from Title VII onto the injury-in-fact requirement from Article III. *See id.* (claiming that because Charlton-Perkins did not plausibly allege an "adverse employment action," he lacks standing to sue). That reasoning is erroneous, again, because whether the plaintiff suffered an injury in fact does not necessarily hinge upon the substantive requirements of any particular cause of action.[5] *See, e.g.*, *Bond*, 564 U.S. at 219. The injury-in-fact requirement instead involves a distinct inquiry into whether the plaintiff suffered a de facto, "actually exist[ing]," real-world harm. *Spokeo*, 578 U.S. at 340. Because the completed past denial of the position to Charlton-Perkins satisfies that test, the district court had Article III jurisdiction.

> 2. *The District Court Likewise Erred In Its Conclusion that Charlton-Perkins Failed to State a Claim of Employment Discrimination*

Though couching its holding in jurisdictional terms, *see Charlton-Perkins*, 2021 WL 3737910, at *6, the district court alternatively reasoned that Charlton-Perkins had also failed to state a claim. *See id.* at *5 (asserting that Charlton-Perkins failed to plead "essential elements of his claims."). We correct that misimpression as well.

---

[5]The conflation of the injury-in-fact and prima-facie-case inquiries is odd for an additional reason: those respective inquiries are performing quite different tasks. The point of determining whether a plaintiff suffered an injury in fact is to determine whether the plaintiff's alleged harm is sufficiently analogous to those sorts of traditional harms believed at the framing to give rise to a "case" or "controversy," and over which Article III conferred the judicial power. *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203–04 (2021). The point of a prima facie case, by contrast, is to determine whether an alleged harm was inflicted *discriminatorily*. *See, e.g.*, *Lindsay v. Yates*, 578 F.3d 407, 415 (6th Cir. 2009). Of course, there are all sorts of cognizable de facto injuries that have nothing to do with discrimination. Even in the absence of discrimination, in other words, injuries can be de facto, concrete, and particularized, and thus satisfy Article III.

At the outset, we note the district court's apparent assumption that to even state a claim, Charlton-Perkins's complaint had to plead a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). To the contrary, the Supreme Court has held that plaintiffs are not required "to *plead* facts establishing a prima facie case," given that the *McDonnell Douglas* framework "is an evidentiary standard, not a pleading requirement." *Swierkewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002) (emphasis added); *see Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012). Instead, to state an employment-discrimination claim, Charlton-Perkins only needed to plead sufficient facts from which we could plausibly conclude that defendants failed to hire him because of his gender.

But even setting that issue aside, Charlton-Perkins *did* plausibly plead a prima facie case of employment discrimination. Indeed, the district court erred in concluding that Charlton-Perkins was required to establish that someone else filled the position to state a prima facie case. That is the default rule, true, because it helps give rise to an inference that the failure to hire was discriminatory. *See Lindsay v. Yates*, 578 F.3d 407, 415 (6th Cir. 2009); *see also White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 241–42 (6th Cir. 2005). Yet as courts have recognized, when an employer discriminatorily cancels a position to avoid hiring an applicant of a disfavored class, the applicant need not establish that somebody else filled the position. *See, e.g.*, *Moore v. Abbott Labs.*, 780 F. Supp. 2d 600, 613 (S.D. Ohio 2011) ("Cancellation does not bar a discrimination claim, however, if the plaintiff can establish that the defendant cancelled the position specifically to unlawfully discriminate against the plaintiff." (citing *Storey v. City of Sparta Police Dep't*, 667 F. Supp. 1164, 1169–70 (M.D. Tenn. 1987)); *see also Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013) (recognizing that an employer may engage in pretextual cancellation of a position to avoid hiring a racial minority).

We understand Charlton-Perkins to make such a claim here—that defendants not only failed to hire him because of his gender, but they then canceled the search itself as a pretext to conceal the discriminatory reason for the failure to hire. *See, e.g.*, Opp'n to Mot. to Dismiss at 8–9, R.10; *see also* Recording of Oral Arg. at 3:13–3:22 (asserting that UC canceled the position to "cover[ ] up the fact that they engaged in discrimination"). Thus, not only has Charlton-

Perkins alleged a ripe, de facto injury under Article III, but he has also plausibly pleaded an adverse employment action on the merits.

Defendants' response to that argument is merely to complain that Charlton-Perkins never alleged in his amended complaint that defendants canceled the position "to unlawfully discriminate against him." Appellees' Br. at 20. As Charlton-Perkins points out in his reply brief, however, this claim is difficult to understand. Paragraph 25 of the amended complaint states, specifically,

> The actions of Defendants Petron[6] and Uetz, taken under color of state law, in not hiring Dr. Charlton-Perkins and *cancelling the search* were committed intentionally, purposefully, maliciously and in conscious and deliberate disregard for Dr. Charlton-Perkins'[s] right to not be subjected to gender discrimination in connection with an award of a faculty position in a public institution receiving federal funds to support its programs and operations.

Amended Complaint ¶25, R.8 (emphasis added). In the context of the rest of the complaint and in the light most favorable to the nonmovant, *see Ritchie*, 15 F.3d at 598, we read that paragraph as saying, at the very least, that defendants canceled the search to facilitate their allegedly unlawful gender discrimination against Charlton-Perkins. There was thus no need for him to additionally allege that somebody else filled the (canceled) position. *See Moore*, 780 F. Supp. 2d at 613; *Storey*, 667 F. Supp. at 1169–70; *Evans*, 716 F.3d at 620.

Perhaps realizing that paragraph 25 is, indeed, the relevant allegation that canceling the search was done with a discriminatory purpose, defendants also argue that Charlton-Perkins waived that theory in his briefing below. *See* Appellees' Br. at 21–22. There, Charlton-Perkins remarked that he was "not alleging that it was clearly established that cancelling a job search constitutes a stand-alone act of discrimination." Opp'n to Mot. to Dismiss at 14, R.10. In defendants' view, that remark represented Charlton-Perkins's advisory to the district court "that

---

[6]Both the amended and original complaints misspell Petren's last name as "Petron." *See generally* Appellees' Br. Here, we leave the spelling as it appeared in the amended complaint, though we have corrected it elsewhere throughout this opinion.

the discriminatory act he is alleging in this lawsuit is Appellees' refusal to follow the search committee's recommendation,**7** **not** the decision to cancel the job search." Appellees' Br. at 22.

We disagree with this characterization of Charlton-Perkins's brief. In context, what Charlton-Perkins was responding to was defendants' strawman contention that no case holds that mere cancellation of a job opening (without evidence of discriminatory purpose) "constitutes a stand-alone act of discrimination." *See* Opp'n to Mot. to Dismiss at 14, R.10; *see also* Mot. to Dismiss at 8, R.9 ("Plaintiff cannot allege it was 'clearly established' that the Individual Defendants were prohibited from canceling the job search in question."). His actual argument, as he made apparent in the very same opposition brief, is that a discriminatory failure to hire plus a discriminatory cancellation of a job opening still constitutes a cognizable adverse employment action, even though nobody was ever hired for the job. *See, e.g.*, Opp'n to Mot. to Dismiss at 8, R.10 ("[R]ather than 'do[ing] what it was supposed to do,' UC cancelled the search ensuring that Dr. Charlton-Perkins would never be hired for the specific position. One need not be a metaphysician to recognize that what Defendants did to Dr. Charlton-Perkins when they refused to hire him was an adverse employment action."); *see also id.* at 9 ("There are no facts in [that case] to suggest, *as there are here*, that the cancellation of the vacancy was attributable to discriminatory motives." (emphasis added)). In short, Charlton-Perkins did not waive the argument that defendants' cancellation of the search was itself part of defendants' alleged discriminatory scheme.

Last, we are unpersuaded that the various cases defendants invoke compel a different result. Take first our unpublished decision in *Reeves v. Tennessee Farmers Mutual Insurance*

---

**7**We noted above the tension between Charlton-Perkins's allegation that the search committee's recommendation would "normally" be followed and his allegation that the search committee was thus "vested with the authority to determine" the hire. *See supra* note 1. The latter allegation is probably too strongly worded; it seems that the CBA established a *presumption* that UC would follow the recommendation, but that it could reject that recommendation in certain unusual circumstances. The district court noted this discrepancy, but it then erroneously drew two inferences against Charlton-Perkins to conclude that his claims are "non-concrete": (1) that because UC merely *normally* had to follow the recommendation, no concrete injury ensued from its failure to do so, and (2) nothing in the pleadings shows that Charlton-Perkins is entitled to "enforce the CBA." *See Charlton-Perkins*, 2021 WL 3737910, at *4. Whether Charlton-Perkins can enforce the CBA, however, is simply irrelevant to whether he suffered a de facto injury from defendants' failure to hire, and his Title IX and § 1983 claims do not hinge upon whether he is an intended beneficiary of the CBA. Moreover, the fact that UC rejected the presumptive hire is actually probative of discrimination—UC "normally" would have hired Charlton-Perkins, but it then took the abnormal step of deviating from that recommendation, potentially because of his gender.

*Co.*—what defendants call their "central case." 555 F. App'x 509 (6th Cir. 2014); Appellees' Br. at 17–18. *Reeves* concerned a job opening the Tennessee Farmers Mutual Insurance Company ("Farmers") had for an adjuster position. *Reeves*, 555 F. App'x at 510. Farmers put a regional claims manager, Delk, in charge of the hiring process to fill the position. *Id.* The eventual plaintiff, Reeves, told Delk that she was interested in applying. *Id.* Yet Delk told Reeves that he would not hire her, as he had "safety concerns" about a woman working in the position. *Id.* Reeves applied anyway. *Id.* Delk then interviewed nine candidates, concluding that his top choice was either a man named Martin or, after all, Reeves. *Id.* Delk offered the job to Martin, who accepted it. *Id.*

Reeves complained to management at Farmers that the hiring process had been unfair. *Id.* Management called Delk, who admitted to commenting that he would not hire a woman for the position. *Id.* Within hours, management decided to withdraw Martin's offer and totally restart the hiring process with a new manager named McDonald. *Id.* That new team (*sans* Delk) reinterviewed Reeves and several other candidates. *Id.* at 510–11. They thought Reeves performed poorly in her interview, however, and offered the position to another female candidate. *Id.* at 511.

Reeves then filed suit against Farmers under Title VII. *Id.* She argued "that Delk's offer to Martin was an adverse employment action[,] even though Farmers rescinded the offer almost immediately." *Id.* The district court granted summary judgment to Farmers, reasoning that because Reeves "could not show that a similarly-situated male filled the position," she had not stated a prima facie case of discrimination. *Id.*

On appeal, we affirmed. *Id.* at 512. We assumed that Title VII (and Reeves's analogous state-law claim) each require an "adverse employment action." *Id.* at 511. That showing entails "a *significant* change in employment status, such as hiring, firing, [or] failing to promote[.]" *Id.* at 512 (emphasis added) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Applied to Reeves's case, however, "Delk's offer to Martin did not effect *significant* change in anyone's employment status." *Id.* (emphasis added). That was because Martin's offer was withdrawn "almost immediately," and any taint from the original search was quickly purged with

a new and unbiased hiring process that fairly considered Reeves. *Id.* at 511. So the offer to Martin never "ripened" into an adverse employment action. *Id.* at 512.

Despite that superficially favorable language, it turns out that *Reeves* is distinguishable from Charlton-Perkins's case in important respects. First, UC never purged the alleged taint by re-running an unbiased hiring process in which Charlton-Perkins got a fair shot at competing. Defendants instead simply canceled the position, which he says was likewise done discriminatorily. *See* Amended Complaint ¶25, R.8. Second, and relatedly, *Reeves* seems to suggest that when someone is divested of a job opportunity based on discrimination, that divestment is *de minimis* and non-actionable if the defendant quickly re-runs an unbiased search in which the spurned candidate gets a fair shot. *See Reeves*, 555 F. App'x at 512 (quotation omitted) (citing a case for the proposition that "temporary removal from a position" is *de minimis* and thus not "a materially adverse employment decision"). That seems to be why the *Reeves* court emphasized Farmers's "immediate" rescission of its offer to Martin—such a "temporary" effect from the initial offer was not a "significant" change in employment status. *Id.* Here, by contrast, because UC never re-ran the search, Charlton-Perkins alleges that he has languished for years without benefit of the position. For those reasons, *Reeves* has no effect on our conclusion that Charlton-Perkins plausibly pleaded a de facto injury and an adverse employment action.

We find defendants' various out-of-circuit, likewise-unpublished decisions similarly unpersuasive. *See* Appellees' Br. at 18–19 (collecting cases). True, those decisions seem to suggest that when an employer fails to hire a plaintiff and yet never hires anyone for the position, no adverse employment action occurs. In our view, however, those cases are distinguishable at best and wrongly decided at worst. Several involve no claim of pretextual cancellation of a job search, as here, and they otherwise treat the plausible allegation of all four factors of a prima facie case—including that someone else was hired for the position—as an absolute prerequisite to pleading an employment-discrimination claim. *See, e.g.*, *Terrell v. Paulding County*, 539 F. App'x 929, 933 (11th Cir. 2013); *Lula v. Network Appliance*, 255 F. App'x 610, 612 (3d Cir. 2007); *Abernathy v. S. Star Cent. Gas Pipeline*, No. 12-2144-EFM, 2013 WL 3013573, at *7 (D. Kan. June 17, 2013).

In contrast to that approach, the Supreme Court has repeatedly instructed us that the prima-facie-case requirement is not "an inflexible rule" and instead may vary under particular factual circumstances. *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 228 (2015) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 575 (1978)); *see also McDonnell Douglas Corp.*, 411 U.S. at 802 n.13 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."). This is such a case. When the plaintiff alleges that defendants canceled the position itself as a pretext to conceal a discriminatory failure to hire, it would be nonsensical to say the plaintiff suffered no adverse employment action unless he could also show that someone else was hired for the nonexistent position.

## V.

We hold that Charlton-Perkins plausibly alleged both a de facto injury sufficient to confer Article III jurisdiction and a ripened employment-discrimination claim under Title IX and 42 U.S.C. § 1983. We take no position on the various affirmative defenses raised below, such as sovereign and qualified immunity, which the district court never addressed. *See, e.g.*, *Taylor v. City of Saginaw*, 11 F.4th 483, 489 (6th Cir. 2021) ("We are a court of review, not first view." (cleaned up)). We instead remand the case for the district court to consider those arguments in the first instance.

**REVERSED**.